# AFFIDAVIT OF MICHAEL J. CONNELLY

I, Michael J. Connelly, being duly sworn, do depose and state:

1. I am an Inspector with the United States Postal Inspection Service ("USPIS") assigned to the Boston Division. I have been a Postal Inspector for six and one-half years. I am currently assigned to a major crimes team which investigates robberies and burglaries of postal facilities, physical assaults of postal employees, and prohibited mailings to include illegally shipped controlled substances and child exploitation materials including child pornography. I have completed the USPIS Basic Inspector Training (BIT) program in Potomac, MD and have conducted and assisted in numerous investigations into the violation of both state and federal laws including mail & wire fraud, identity theft, and prohibited mailings to include both illegal narcotics and child pornography. I have investigated and/or participated in dozens of investigations involving the violation of federal statutes relating to the U.S. Mail.

2. This affidavit is submitted in support of a criminal complaint charging Maurice Williams Miner-Gittens (GITTENS) and Keyon Taylor (TAYLOR) in a conspiracy to rob and the attempted robbery, as well as the kidnapping, of a United States Postal Service ("USPS") letter carrier, which included the assault, battery, shooting, and kidnapping of a United States Postal Service employee on December 20, 2013 in Dorchester, MA. In addition, I make this affidavit in support of a search warrant for the Deoxyribonucleic Acid ("DNA") belonging to TAYLOR. At the time of the assault, the USPS employee was engaged in the performance of his official duties and had lawful charge, control and custody of mail, money and other property of the USPS. The information in this affidavit is based upon my personal participation in this investigation; my familiarity with reports made to me by other law enforcement agents and other concerned parties; and other information collected to date as part of this investigation. I am therefore familiar with the facts and circumstances of the individuals and federal offenses described in this affidavit. This affidavit does not, however, set forth every fact that I know about this investigation, but simply those facts that I believe are sufficient to show the probable cause necessary for the issuance of the requested criminal complaint and arrest warrants.

## INITIAL INVESTIGATION

3. On December 20, 2013, Boston Police Department (BPD) received one or more telephone calls around 6:05 to 6:07 p.m. The caller or callers reported that a USPS letter carrier had been assaulted and shot. BPD personnel responded to the scene, spoke briefly to the USPS victim and arranged his transport to Boston Medical Center.

4. The victim said that he was making mail deliveries in the vicinity of 35 Bailey Street in Dorchester, MA. While so engaged, he noticed a white U-Haul moving van directly behind his postal truck. When he returned to the truck, a black male between 5'8" and 5'10" in height, and weighing approximately 150-160 pounds, with a black hooded jacket (possibly a Northface or perhaps a Northface-style black jacket) or sweatshirt and a black mask covering the lower portion of his face, jumped into his truck and pointed a gun at him. The victim described the gun as a small caliber revolver. For the reasons set out below, we now believe that this assailant was KEYON TAYLOR.

5. According to the victim, as the gun was pointed at him, the suspect demanded "the drawer" repeatedly but the victim told the assailant that he did not have a drawer.[1] During this initial confrontation, the assailant immediately pointed a firearm at the victim's head. The victim stated he was in fear for his life and afraid the assailant would shoot him in the head. He therefore tried to push the barrel of the gun away and tried to push the assailant back out of the Postal vehicle. At that point, the assailant shot the victim in his right wrist. The victim stated that after being shot in the wrist, he complied with his assailant's orders as he was in fear for his life.

6. After he was shot, the victim was struck repeatedly by the assailant using both the pistol and his shod feet. As a result, the victim was bleeding from multiple injuries to his head and other areas of his body. He was ordered into the rear of the Postal truck and told to strip off his uniform, which he did. He turned over the USPS uniform, to include his pants and a vest, to the attacker as well as his wallet, cell phone and keys. The suspect ordered the letter carrier to

---

[1] In the rural areas of some southern states, USPS delivery vehicles carry a cash drawer for use in selling postage and stamps. USPS vehicles in Boston do not carry a cash drawer.

lie face down in the rear of the vehicle and told him not to look up or he would be killed. The assailant went towards the front of the truck but returned a second later after he saw the letter carrier glance in his direction. The assailant resumed kicking the letter carrier and told him repeatedly that he would kill him.

7. Law enforcement spoke with multiple witnesses during the course of canvassing the neighborhood after the assault, a number of whom observed a white U-Haul van on Bailey Street in the area of the assault and further down the street. A witness who lives on Bailey Street said she thought she heard the sound of something dropping, and she looked out when she heard the sound of cars honking. She looked out her window and saw cars blocked by the U-Haul van and the Postal truck; she estimated that the U-Haul van and USPS truck were approximately five (5) feet apart from each other. The witness also saw a male get out of the driver's side of the U-Haul van who was described as being of average height and weight and direct traffic around the U-Haul van and the Postal truck. Shortly after, the witness saw both vehicles pull away, one very shortly after the other.

8. The assailant used the letter carrier's USPS keys to drive the USPS vehicle down Bailey Street towards Dorchester Avenue. As the assailant turned right onto Clermont Street, the victim, who later said he believed he was going to be killed, made the decision to open the rear door of the truck while it was still in motion and jumped out. The assailant continued driving for only a short distance and either got the USPS vehicle stuck in a snow bank and then abandoned it or just abandoned it on Clermont Street shortly after the turn from Bailey Street.

9. As the victim fled from the USPS truck, he saw a white U-Haul van behind the USPS vehicle. As stated, he had observed what he thought to be the same white U-Haul van parked near his Postal truck just prior to the assault. The victim observed a black male with a dark complexion driving the van. He estimated the driver's age at approximately 30 years old. The victim was yelling for help repeatedly and was met by several individuals who contacted the police and one who sheltered him in her car.

10. Witnesses saw a male run away from the USPS truck heading down Clermont Street away from Bailey Street after the USPS truck went up onto the sidewalk and stopped while on Clermont Street.

11. Consistent with the witnesses' observations of a male fleeing from the USPS

truck, law enforcement found a path of boot prints in the same size and pattern in the snow on Clermont Street, which led from the driveway of #3, Clermont Street into several backyards of residences on Clermont and Fuller Streets. It appears that TAYLOR ran part way down Clermont Street after abandoning the USPS truck and then ran down a driveway before going over several fences and into a backyard. The boot prints made a visible path that led to the back of 49 Fuller Street where police later found the victim's bloody Postal uniform, personal keys, and cell phone in a blue plastic recycling or trash bin behind the residence. One piece of what appeared to be a purple nitrile glove was found on a chain link fence in the same yard of 49 Fuller Street. A reddish brown substance, suspected of being blood, was also swabbed from the top of the fence, right under the piece of purple glove, and collected by Boston Police Crime Lab technicians. A second piece of purple nitrile glove was found nearby, also in the backyard of 49 Fuller Street.

12. While the investigation was continuing at the initial scene, a white U-Haul van, Arizona Registration Number AE84334, that fit the description provided by the victim and several witnesses, was observed going south on Washington Street in Dorchester at approximately 10:05 p.m. that same evening. The van slowed and nearly came to a complete stop in the middle of the intersection at Washington Street and Gallivan Boulevard before pulling into a Sunoco gas station on the corner, which is approximately 0.5 miles from the scene of the attack. Law enforcement officers followed the van into the gas station.

13. Postal Inspectors and Boston Police uniformed officers approached the white van and observed an unknown reddish-brown smear on the driver's side rear quarter panel, above the rear wheel. The officers also saw, from their position outside the van, a black, hooded jacket or sweatshirt in the van as well as one or more purple nitrile gloves in a center cup holder in the front of the van similar to the one noted in paragraph 11 above.

14. There were two black males in the van; they were removed from the van and searched for weapons. As the driver's side door was opened, an officer noted a strong smell of marijuana emanating from the vehicle. Additionally there appeared to be a small quantity of marijuana in a plastic bag in the pocket of the driver's side door. The two men were taken to Area C-11 of the Boston Police Department where they were identified, *Mirandized* and questioned after being told they were not under arrest and were free to leave. The driver of the

U- Haul van admitted to having rented the U- Haul van and to having driven the van on Bailey Street, the area of the assault, earlier that evening. The driver also said that he was directly behind a postal truck while on Bailey Street. He also admitted that the suspected marijuana was in fact marijuana and that it belonged to him. The second man claimed that he had not been in the van prior to about 8:00 p.m. that night. The driver of the U- Haul van was identified as MAURICE WILLIAM MINER-GITTENS and the passenger was also identified by name; he is identified herein as "XC." GITTENS reported that XC's nickname is "Cam." Officers subsequently determined that GITTENS has a number stored in his cell phone under the name "Cam".

## GITTENS' PHONE

15. On December 21, 2013, GITTENS provided written consent to review his iPhone 5 bearing serial number C39KLHB3FH19. Later on December 21, 2013 a forensic examination was conducted on the iPhone noted above.

16. A preliminary review of the examination revealed GITTENS' cell phone with the number 857-222-XXXX was used to attempt two separate phone calls to an individual listed in the contacts section as "Cam", identified herein as XC. The attempted phone calls were made on December 20, 2013 at approximately 6:12:09 p.m. and at 6:12:32 p.m. These attempted calls were made to XC at the following numbers; 617-682-XXXX and 857-928-XXXX, several minutes after the shooting of the USPS driver. Both of the preceding telephone numbers were stored under the same contact labeled as "Cam" in GITTENS' cell phone.

17. On December 20 at approximately 6:17:02 p.m., GITTENS received an instant message (IM) from "Cam" with the following text "Ima hit u wen to come threw".

18. On December 20 at approximately 6:31:14 p.m., GITTENS received an IM from "Cam" with the following text: "Where key at". "Key" is a street name for KEYON TAYLOR, who is a known associate of XC and a friend of GITTENS, based on aliases from Boston Police Department files as well as a review of the contacts in GITTENS' cellular phone. This text was sent during the time period we believe TAYLOR was in flight from the scene of the assault on the USPS letter carrier.

19.  Additional review of the cell phone revealed GITTENS and "Cam" made approximately eight (8) phone calls to each other in an approximately two hour period following the shooting of the USPS letter carrier.

## U-HAUL

20.  On December 21, 2013, the government applied for and was issued a search warrant by this court to search the U-Haul cargo van, bearing Arizona Registration Number AE84334, the vehicle GITTENS was driving on the previous evening. See docket number 13-m-5151 JGD. Among the items seized were a black hooded jacket recovered from the floor of the van and a purple nitrile glove, recovered in a center cupholder in the front of the van. Law enforcement observed that the glove is of the same style and type as the glove recovered from the rear fence of 49 Fuller Street, in the suspected path of flight of the assailant, as previously noted in paragraph 11 above. In addition, samples were taken of suspected blood from the exterior of the van.

21.  Investigators questioned employees of U-Haul Moving and Storage of Brockton located at 661 N. Main Street, Brockton, MA. U-Haul employees confirmed that the U-Haul cargo van, Arizona Registration Number AE84334, was rented from their office on December 19, 2013 at approximately 4:55 pm, one day before the assault on the USPS letter carrier. The customer information associated with this rental is as follows:

| | |
|---|---|
| Customer: | Maurice Miner-Gittens |
| | XX Mascot Street |
| | Dorchester Center, MA 02124 |
| Drivers License: | ******4503, MA, 1017 |
| Card Type: | XXXX XXXX XXXX 4278 |

22.  A check of the Massachusetts Registry of Motor Vehicles (RMV) database for Maurice Miner-Gittens yielded one result. Specifically, the RMV lists a Maurice William Miner-Gittens, DOB XX/XX/1991, as holding an active driver's license #SXXXX4503, which is

the same driver's license number as used to rent the U-Haul van.

23. Furthermore, a review of U-Haul's video surveillance footage during the December 19, 2013 rental of the van shows two other males who came into the U-Haul with GITTENS. One of the males is wearing what appears to be a black Northface jacket and a red baseball cap. Upon examination of still images taken from the video surveillance footage of U-Haul, as well as a review of RMV and previous Boston Police booking photographs, the physical features of the male accompanying GITTENS in the Northface jacket bears a notable resemblance to TAYLOR.

## **FURTHER INVESTIGATION**

24. As noted above, during the consensual interview of GITTENS on the night of the assault, after being advised of his *Miranda* rights, GITTENS admitted to renting and driving the U-Haul vehicle which he was found operating on the evening of December 20, 2013. He stated to law enforcement that he was parked behind a USPS truck at the top of Bailey Street, as the USPS truck was blocking the road. Gittens told investigators that the rear door of the USPS truck opened and an Asian man who was bleeding from the head ran out of the back of the truck, opened the door to the U-Haul, and then ran down Bailey Street. GITTENS also stated that he had seen someone else run from the USPS truck in the other direction; this person was dressed in a black jacket with a hood and yellow colored boots similar to Timberland boots. GITTENS stated that this individual fled down Clermont Street towards Fuller.

25. Investigators canvassed the area on the night of the incident and during the days that followed. As a result, investigators identified multiple witnesses to portions of the incident. Two different witnesses stated that the unknown individual who ran from the USPS truck, i.e., the assailant, ran down Clermont Street for only a short distance and then cut through a yard between two houses not far from where the USPS truck was abandoned.

26. A query of information relating to GITTENS and TAYLOR with the Boston Police Department yielded several pieces of information. Detectives from the Boston Police Department identified GITTENS and TAYLOR as known associates who have been found in each other's company in a variety of locations around Morton Street (which is in Dorchester not

far from the assault location) and the surrounding areas in the past several years. Additionally XC was stopped and questioned on previous occasions in the same time period in the company of both GITTENS and TAYLOR. According to Boston Police intelligence, both TAYLOR and XC are known associates of the Corbet Street gang. The Corbet Street gang members are generally from Dorchester and their activity has typically been in the same general vicinity as the assault on December 20, 2013.

27. On December 26, 2013, investigators went to TAYLOR's mother's residence on Carpenter Avenue in Attleboro, MA and located TAYLOR in the bedroom of the residence. He was then arrested on a default warrant previously issued by the Dedham, MA district court for failure to appear.

28. TAYLOR was brought to the interview room of the Attleboro Police Department and was read his *Miranda* rights. During the course of the interview, law enforcement observed cuts or puncture wounds on TAYLOR's left hand, in the front at the top of his palm. An Attleboro Police Department detective took photographs of his hands. It was observed that TAYLOR's left hand had two cuts in the webbing of his hand. The cuts were located between the thumb and index fingers and appeared to be recent.

29. Investigators then returned to the Carpenter Avenue address, and spoke with TAYLOR's mother. TAYLOR's mother provided written consent for investigators to conduct a search of her apartment and the hallway closet adjacent to her apartment which her family uses. Several items were seized with her consent including multiple pairs of shoes, two black jackets including a black Northface winter jacket with a hood. Additionally, TAYLOR's mother stated to investigators that upon returning to the residence on December 23, 2013 from a Mexican cruise, she and her boyfriend entered the residence and smelled a rotten odor. TAYLOR's mother determined that the smell was emanating from a blue backpack with dirty clothes and another bag as well. TAYLOR's mother said the items belonged to "Mo Gittens," which numerous witnesses confirmed is a name used by GITTENS. TAYLOR's mother then stated that her boyfriend had thrown the backpack and the other bag into the apartment complex's dumpster, which investigators recovered as the trash had not been collected yet. TAYLOR's mother's boyfriend identified the items he had thrown away as the same ones investigators had recovered from the dumpster.

30. Inside the discarded backpack were multiple items including a temporary Massachusetts ID in the name of Maurice Gittens, as well as pay stubs in the same name and a number of other identifying documents.

31. TAYLOR's mother was then interviewed further by investigators. TAYLOR's mother stated that her son TAYLOR and GITTENS had grown up together and had been friends for over ten (10) years and that they were often together. She added that Mo, or Maurice, GITTENS was supposed to be staying with them at the Carpenter Avenue address but when she asked her son TAYLOR about why GITTENS was not there, he would not talk about it.

32. A review of video surveillance footage from the area of the attack revealed several results. Two cameras were identified on a private residence, located at 74 Fuller Street.[2] A review of the surveillance camera footage revealed that at approximately 5:51:28 pm, a U-Haul van, similar in appearance to the one rented by GITTENS, drove up Fuller Street towards Washington Street. At approximately 5:54:23 pm, the camera shows the victim's USPS vehicle driving up Fuller Street towards Washington Street. At approximately 6:12:06 pm, which is the approximate time of the calls made from GITTENS' phone to the contact listed as "Cam", a U-Haul van (again, similar to the one rented by GITTENS) is seen pulling up in front of the residence and parking on the south side of Fuller Street directly in the camera's view. At 6:12:39 pm, the driver's door of the U-Haul opens and the driver throws what appears to be a large cardboard box onto the street and then closes the door. The driver also appears to be holding something in his hand, which is believed to be a cell phone. At approximately 6:13:26 pm the U-Haul van pulls away from 74 Fuller Street with its headlights off. At approximately 6:13:42 pm, an unknown individual, dressed in what appears to be a hooded sweatshirt or jacket is seen running at a fast pace up Fuller Street in the same direction as that just taken by the U-Haul.

## FORENSIC FINDINGS

33. During the course of the investigation, evidence was collected from a number of locations. Some of these locations included trace amounts of suspected human blood. A number

---

[2] The camera and associated recording system at 74 Fuller Street was found to be approximately 1 hour and 27 minutes fast. The times referenced have been converted to approximate true time.

of samples were submitted to the Boston Police Crime Laboratory, ("lab"):

    a. Suspected blood found on the top of a chain link fence in the rear of 49 Fuller Street, Dorchester, located under a piece of purple nitrile glove. Two samples were taken from the fence, which was located in the path of matching boot prints that led away from Clermont Street and continued to the blue trash or recycling bin behind 49 Fuller Street where the USPS letter carrier's uniform was found;

    b. Suspected blood found on the handle of the blue trash or recycling bin behind 49 Fuller Street where the USPS letter carrier's uniform was found;

    c. Suspected blood found on the USPS letter carrier's uniform, which uniform was found in the blue trash or recycling bin behind 49 Fuller Street. Four pieces containing suspected blood were cut from the uniform, two from the pants and two from the vest; and

    d. Suspected blood found on the U-Haul van exterior, above the driver's side rear wheel well.

34. In addition, an oral swab was taken from the USPS letter carrier, from which his DNA profile was determined by the lab.

35. On December 31, 2013, I received the results of the lab's analysis of the suspected blood sample, identified by the lab as items 11, taken from the chain link fence described in subparagraph 39a above. The lab determined that the sample contained in item 11 contained human blood from a male, very likely came from a single person, i.e., there was just one individual contributor of DNA. The DNA profile extracted from this sample was submitted to the Federal Bureau of Investigation (FBI) Combined DNA Index System (CODIS), and on December 31, 2013, the lab received a CODIS positive identification report in reference to the sample submitted. Details of the report are as follows:

> *The DNA profile has been searched against a database of other unsolved cases in Massachusetts and other states, as well as convicted offenders in Massachusetts and both convicted offenders and arrestees in other states. The above case was linked to a convicted offender in Massachusetts:*

    ***Keyon Taylor (AKA Keyon Anthony Taylor)***

*DOB   XX/XX/1993*
*SSN   XXX-XX-8239*
*PCF#  XXX9611*
*FBI#  XXXX86VC6*

*The DNA profile obtained from the above sample is not a mixture, consistent with having originated from a single individual. The DNA profile on file associated with the individual listed above matches the DNA profile from the evidentiary item at 16 out of 16 locations with conclusive results.*

36.    In standard DNA analysis, a DNA sample is examined at sixteen DNA marker or allele locations. Each location shows the DNA contribution from the mother and the father of the sample contributor unless the sample is incomplete. This results in two numbers (which can be identical) for each location, unless more than one person has contributed to a sample. The significance of this for the present investigation is that the match between the sample in item 11 taken from the fence and the known DNA profile for TAYLOR (collected for CODIS) at sixteen out of sixteen locations gives a very, very high probability that the blood on the fence came from TAYLOR. The BPD lab did not directly compare a known sample of DNA from TAYLOR to the samples it processed, however, as it did not have a sample taken directly from TAYLOR.[3] The CODIS database contains a DNA profile for TAYLOR, however, and that system was able to match the DNA profile in item 11 (after processing by the lab) to the profile on file for TAYLOR.

37.    Additional results were received from the lab on January 17, 2014. Regarding the sample taken from the recycling or trash bin handle, item 56 in the lab's report, there was a full match to the blood sample from the fence (item 11), and to the CODIS profile of TAYLOR. The lab concluded that the sample taken from the handle was consistent with having originated from the same individual that contributed the samples taken from the fence (lab item 11), identified by CODIS as a match to TAYLOR.

38.    Regarding the two samples taken from the USPS letter carrier's pants, lab items 58 & 59, testing by the lab indicated the presence of human blood in the cloth samples and that the DNA profile in the blood matched the oral (buccal) sample taken from the USPS letter carrier

---

[3] A search warrant to collect a DNA sample from TAYLOR is submitted herewith.

at all sixteen allele locations.

39. Regarding the first of the two cloth samples taken from the USPS letter carrier's vest, lab item 60, also found in the trash/recycling bin behind 49 Fuller Street, the lab criminalist concluded that the same DNA profile for the sample from the fence was present as the major contributor of DNA found. This profile is a match to TAYLOR, according to CODIS. A second individual may also have contributed DNA to the sample. The minor contributor's DNA profile is not inconsistent with the USPS letter carrier's DNA profile.

40. As to the second cloth sample taken from the USPS letter carrier's vest, lab item 62, the DNA profile derived from human blood found therein appears to be that of a single contributor. The DNA profile matches that of the USPS letter carrier.

41. The lab criminalist stated that the reddish brown stain (lab item 29) found on the side of the U-Haul van above the driver's side rear was human blood and that a single source DNA profile was identified. Based on a comparison of the above described sample to a known sample of the victim (lab item 13), the criminalist stated that blood was consistent with that of the victim.

42. Additionally, the lab criminalist stated that the purple nitrile glove fragments collected from the same location as the blood, appeared to be torn in the palm area of the glove. It appears that the individual who fled through the back yards of Clermont and Fuller Streets after abandoning the USPS truck cut his hand and tore the nitrile glove he was likely wearing while climbing the fence in an attempt to escape the scene.

## CONCLUSION

43. Based upon the described information above, probable cause exists to believe that the blood taken from the top of the chain link fence, as well as the samples (4) from the Postal letter carrier's uniform, along with the blood found on the outside of the U-Haul van, and the blood taken from the recycling/trash bin handle, each of which has been found to contain DNA material suitable for comparison purposes, matches either the DNA of the victim letter carrier or of KEYON TAYLOR. The Boston Police Department forensic laboratory report indicates that there is DNA material suitable for comparison purposes on each of these samples and the

analysis to date showing a potential match of the DNA obtained from several of the items to the DNA of TAYLOR, based on the CODIS database, should be confirmed by comparison to a known sample provided directly to the lab.

44. Through my work with the Postal Inspectors I know that obtaining a known sample of DNA material for comparison purposes is not an intrusive process but instead entails simply obtaining a buccal (oral) swab. Based on the foregoing, there is probable cause to believe that the DNA of KEYON TAYLOR constitutes evidence of a crime, and it is hereby requested that a warrant issue requiring the said KEYON TAYLOR to provide a DNA sample in the form of one or more oral swabs. Based on our investigation, there further is probable cause to believe that TAYLOR can be found in the District of Massachusetts.

45. Based upon the described information above, I submit there is probable cause to believe that on or about December 20, 2013, MAURICE WILLIAM MINER-GITTENS, (aka Mo,) and KEYON TAYLOR, (aka Key,) violated 18 U.S.C. §§ 2, 371, 1201(a)(5) and 2114 to wit: the assault, kidnapping and attempted robbery of a USPS letter carrier, who had lawful charge, control and custody of mail, money and other property of the USPS, and who was performing his official duties at the time, and conspiracy to commit same.

Michael J. Connelly
United States Postal Inspector

Sworn and subscribed to before me this 21 day of January, 2014, at Boston, Massachusetts.

Honorable Judith G. Dein
U.S. Magistrate Judge